UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE APPLICATION OF CHEVRON )
CORPORATION for an Order )
Pursuant to 28 U.S.C. § 1782 to )
Conduct Discovery for Use in )
Foreign Proceedings, )
 ) Case Nos.   3:10-mc-30022-MAP
and, )                and
 )             3:10-mc-30023-MAP
IN RE APPLICATION OF RODRIGO )
PÉREZ PALLARES, an Ecuadorian )
citizen, and RICARDO REIS VEIGA, )
an American citizen, for an order to )
Conduct Discovery for Use in )
Foreign Proceedings )

MEMORANDUM WITH REGARD TO
APPLICATIONS FOR DISCOVERY UNDER 28 U.S.C. § 1782
December 22, 2010

NEIMAN, U.S.M.J.

　　　Pursuant to 28 U.S.C. § 1782 ("Section 1782") and Rules 26, 30, 34 and 45 of

the Federal Rules of Civil Procedure, Chevron Corporation ("Chevron"), along with

Rodrigo Pérez ("Pérez") Pallares and Ricardo Reis Veiga ("Veiga") (together the

"Individual Applicants"), have applied to this court for orders granting leave to serve

Cristóbal Bonifaz ("Bonifaz") with subpoenae seeking documents and deposition

testimony for use in three pending foreign proceedings.  Pérez and Veiga serve,

respectively, as the Legal Representative and Executive Vice President of Texaco

Petroleum Company ("TexPet"), a subsidiary of Chevron.  The two applications, which

have been referred to this court by Distict Judge Michael A. Ponsor, have been

consolidated for present purposes.

The two foreign proceedings cited by Chevron are (1) a suit filed against Chevron in 2003 in the Provincial Court of Justice of Sucumbios in Nueva Loja, Ecuador (the "Lago Agrio Litigation") and (2) an international arbitration brought by Chevron and TexPet against the Republic of Ecuador ("the Republic"), filed on September 23, 2009, under the Bilateral Investment Treaty ("BIT") between the United States and Ecuador (the "Treaty Arbitration"). Bonifaz, for a period of time, was counsel to the plaintiffs in the Lago Agrio Litigation (the "Ecuador Plaintiffs"). The foreign proceeding cited by the Individual Applicants is a criminal case in Ecuador in which they are charged as defendants together with a number of other individuals.

The instant applications under Section 1782 are among nearly twenty such applications in federal district courts around the country. Given the asserted urgency of these applications, the court established an expedited briefing schedule, invited interested parties to respond, and scheduled a hearing for December 15, 2010. The Republic submitted a partial opposition to the applications, in essence objecting to the production of any document or the disclosure of any information that may be covered by the Republic's work product protection or attorney-client privilege. The Ecuador Plaintiffs also submitted oppositions, claiming that both applications are unwarranted. For his part, Bonifaz, as the respondent to the applications and representing himself *pro se*, indicates that he is prepared to submit himself to the depositions and, in the course of doing so, urges the Republic and the Ecuador Plaintiffs to waive any privileges they may hold.

The parties are quite familiar with the history of the underlying Lago Agrio

Litigation, the Treaty Arbitration, and the Ecuadorian criminal prosecution. Accordingly, the court will not describe that history in significant detail, other courts having previously done so, most recently District Judge Joseph Tauro in *Chevron Corp. v. Shefftz*, --- F. Supp. 2d --- , 2010 WL 4985663 (D. Mass. Dec. 7, 2010). The parties, however, disagree about certain facts relating to these various matters as well as the inferences to be drawn therefrom. In addition, they disagree about the burdens to be met by the applicants and the precedential value of the parallel Section 1782 proceedings.

Given the urgency of the applications, the court will concentrate its efforts on the legal questions raised and the scope of the subpoenae to be issued. As the parties are aware from the court's recent electronic orders, it has granted the applications with regard to the two tribunals in Ecuador but limited the scope of the inquiries and subjected those inquiries to claims of privilege. This memorandum will now describe the court's analysis in greater detail.

## I. SECTION 1782

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). In one way or another, the foreign proceedings cited above arise out of claims originally brought by the Ecuador Plaintiffs that Chevron is liable for environmental and other damages associated with TexPet's involvement in oil exploration and production in the Oriente region of Ecuador between 1964 and 1992.

3

Discovery under Section 1782 is proper if it needs the following threshold statutory criteria: (1) it is directed at a resident of the district in which the court sits; (2) it is intended for use before a foreign tribunal; (3) it is based upon the application of a person interested in a foreign proceeding; and (4) it does not require disclosure of privileged materials. *See generally Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 256-65 (2004). A court, when exercising discretion to grant a Section 1782 application, may also consider four additional factors: (1) whether the request is overly intrusive or burdensome; (2) whether the person from whom discovery is sought is a party in the foreign proceeding; (3) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign tribunal to federal-court assistance; and (4) whether the request appears to be an attempt to circumvent foreign proof-gathering procedures of the foreign tribunal. *Id.*

## II. BACKGROUND AND ARGUMENTS

Chevron and the Individual Applicants have submitted extensive briefs and exhibits which all but relitigate the matters now playing out in the three foreign tribunals, if not the many other Section 1782 applications addressed by other courts to date. They have asked this court to draw inferences that the Ecuador Plaintiffs and the Republic have engaged in improper collusion, fraud and manipulation of the judicial, legislative and political processes in Ecuador, all the while claiming that they themselves are free of any responsibility, whether civil or criminal, for the pollution of the Ecuadorian rain forest or the failure to remediate that pollution in accord with a prior settlement entered into between TexPet and the Republic.

4

In response, the Ecuador Plaintiffs claim that Chevron and the Individual Applicants "have no intention of slowing down their novel § 1782 cottage industry that their lawyers have created." (Document No. 23 at 2.) "The process," the Ecuador Plaintiffs assert, "is simply too effective at directing the limited resources of the Ecuadorian Plaintiffs - members of the indigenous communities of the Ecuadorian basin - and at serving as a deterrent to any consultant or lawyer who dares take up their seventeen year plight." (*Id.*) For its part, the Republic, eschewing hyperbole, has taken a more measured approach, one that facilitates the court's reliance on the Republic's representations made in partial opposition to the two applications. With these positions in mind, the court will now describe (1) some general background, (2) issues concerning Bonifaz, and (3) urgency arguments.

A. <u>General Background</u>

The Republic explains that, from 1993 to the present, indigenous Ecuadorian citizens, now the Ecuador Plaintiffs have been embroiled in litigation against TexPet, now a subsidiary of Chevron, over oilfield pollution in Ecuador. The litigation began in the District Court for the Southern District of New York but, at Chevron's insistence, was conditionally dismissed on *forum non conveniens* grounds in favor of litigation in Ecuador. The re-filed case, *i.e.*, the Lago Agrio Litigation, is now at the epicenter of multiple collateral attacks launched by Chevron, which alleges that the Ecuador Plaintiffs are engaged in a massive fraud and that the Government of Ecuador has interfered with various judicial processes.

The Republic also explains that, since 2004, Chevron has commenced an AAA

arbitration in New York, two major international arbitrations and, more recently, a series of Section 1782 discovery actions, against the Ecuador Plaintiffs and the Republic, even though the Republic has affirmatively refused to intervene in the Lago Agrio Litigation on behalf of either party. The court will now describe those proceedings in some detail.

First, in June of 2004, Chevron brought an AAA arbitration in New York against the Republic's state-owned oil company, PetroEcuador, seeking a declaration that the Lago Agrio Litigation should be dismissed outright or that PetroEcuador should be contractually obligated to indemnify Chevron for all defense costs and any liability that Chevron might incur in that litigation. PetroEcuador and the Republic filed a petition to stay the AAA arbitration in New York state court, which Chevron removed to the District Court for the Southern District of New York. Over Chevron's objections, that court permanently stayed the AAA arbitration in June of 2007 on grounds that the Republic was not a party to or otherwise contractually bound by the agreement that, Chevron argued, committed the Republic to arbitration and indemnification. *See Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452 (S.D.N.Y. 2001), *aff'd,* 296 Fed. Appx. 124 (2d Cir. 2008).

Second, in what the Republic calls an overall plan to discredit the Ecuadorian judiciary, Chevron filed an international arbitration under the BIT against the Republic in December of 2006, alleging that it had been "denied justice" by the Ecuadorian judiciary through long delays in the resolution of certain contract disputes unrelated to the Lago Agrio Litigation. Chevron cited the Lago Agrio Litigation as an example of the

6

alleged bias of the Ecuadorian judiciary.

Third, the Republic explains, Chevron on September 23, 2009, initiated a second BIT arbitration -- the Treaty Arbitration -- against the Republic, alleging that the Republic had violated the BIT by "allowing" the Lago Agrio Litigation to proceed. In Chevron's view, the Republic had already released it from all claims and, thus, was responsible even for the acts of the private-party plaintiffs. Chevron also alleged in the arbitration that the Republic had colluded with the Ecuador Plaintiffs in causing the Lago Agrio court to deny Chevron due process. Among other relief, Chevron sought a declaration that it is not liable to the Ecuador Plaintiffs, that PetroEcuador is instead exclusively liable for any damages that may be awarded, and that any judgment against it should be deemed unenforceable.

Fourth, as mentioned, Chevron has filed a series of Section 1782 actions, including the one at bar, seeking discovery with regard to both the Treaty Arbitration and the Lago Agrio Litigation. Chevron alleges misconduct by the Ecuador Plaintiffs, including improper communications with the court-appointed expert and collusion with the Republic. As indicated, the Individual Applicants also assert their need for discovery as it relates to the Ecuadorian criminal matter.

B. Bonifaz

Bonifaz acted as lead counsel for the Ecuador Plaintiffs during the New York and Lago Agrio actions from 1993 until 2006. When Chevron brought the AAA arbitration, Bonifaz represented the Republic *pro bono* until approximately October of 2005, when Winston and Strawn LLP took over as counsel. In addition, Bonifaz was

terminated as counsel for the Ecuador Plaintiffs in the Lago Agrio Litigation in 2006. Bonifaz also acknowledges having worked with the Republic to pass legislation in the late 1990s, which legislation may well have enabled the Ecuador Plaintiffs to pursue their case in Ecuador.

In its Section 1782 application, Chevron asserts that Bonifaz is likely to have documents and be able to provide testimony that is relevant to three issues in the foreign proceedings: (1) "collusion" between the Republic and the Ecuador Plaintiffs with respect to efforts to "get around and vitiate" a release granted by the Republic to TexPet in 1998; (2) efforts by the Republic to use "sham criminal charges" to undermine TexPet's release for the benefit of the Ecuador Plaintiffs; and (3) "improper conduct" by the Ecuador Plaintiffs in connection with experts. Chevron also puts much stock in the fact that Bonifaz stands willing to be deposed and provide the documents sought should the Ecuador Plaintiffs and the Republic waive their claims of privilege. In addition, Chevron cites Bonifaz's concerns that the attorneys who took over the Lago Agrio Litigation for the Ecuador Plaintiffs may have ill-served those clients. What Chevron has not cited, however, is Bonifaz's equally strong assertion that Chevron's Section 1782 application is "full of misstatements, misleading implications, [and] false allegations, perhaps out of ignorance of facts which will become evident for Chevron upon completion of the discovery it is seeking." (Document No. 10 ¶ 2.)

For their part, the Individual Applicants seek documents from Bonífaz related to the following: (1) the supposed "engineering" of the criminal charges through the "improper collusion" of the Republic and the Ecuador Plaintiffs' lawyers in the Lago

Agrio Litigation; and (2) the "provenance of the corrupt science" that Ecuadorian prosecutors are citing as the basis of the criminal charges against them. In response, Bonifaz disclaims any participation in the criminal charges brought by the Ecuadorian authorities as well as any knowledge of the expert appointed by the court in the Lago Agrio Litigation.

C. Urgency

In their application, the Individual Applicants assert that they urgently need the discovery sought because a preliminary hearing on the criminal charges is scheduled in Ecuador for January 5, 2011. To date, they assert, six district courts have granted their Section 1782 applications seeking exculpatory evidence for their defense, the same evidence sought here.

For its part, Chevron claims that it too has an urgent need for the discovery sought, for two reasons. First, as Chevron asserted in its supporting memorandum filed on November 19, 2010, the Treaty Arbitration was proceeding quickly, with a jurisdictional hearing to take place the week of November 22, 2010. As made clear during the course of the hearing before this court on December 15, 2010, however, the jurisdictional hearing did not concern the merits of the arbitration. Nonetheless, it also became clear during the the December 15th hearing that Chevron has asked the Treaty Arbitration tribunal to immediately proceed to the merits and that the tribunal, in turn, has asked the Republic to respond to that request by December 31, 2010.

As a second ground for urgency, Chevron asserts -- no doubt echoing its prior Section 1782 applications -- that it has to respond to new expert reports submitted by

the Ecuador Plaintiffs in the Lago Agrio Ligitation on September 16, 2010, which reports evidently claim $113 billion in damages.  Chevron has further asserted that, in light of the Ecuador Plaintiffs' pressing for a speedy resolution of the Lago Agrio Litigation, the possibility exists that evidence in that litigation may close or a judgment could be entered in the near future.  Accordingly, Chevron argues, it needs to immediately submit further evidence of "fraud and collusion" to that tribunal.

As it turns out, Chevron subsequently informed this court that the Lago Agrio court has just issued an "autos para sentencia" order, essentially indicating that the evidentiary phase of the case is closed and that the matter is ready for an imminent judgment.  (See Document No. 44.)  Nonetheless, Chevron asserts, it intends to offer evidence obtained through the various Section 1782 proceedings through "international principles of due process and Article 118 of the Ecuadorian Constitution, which allows parties to present evidence prior to judgment, albeit under a more restrictive standard." (*Id.*)  Given this assertion and the fact that the auto para sentencia order might be appealed or vacated, this court has not altered its approach to Chevron's instant Section 1782 application.

### III. DISCUSSION

As a general matter, courts addressing parallel Section 1782 proceedings involving some of the present parties have permitted discovery, albeit with some limitations.  *See, e.g., Chevron Corp. v. 3TM Consulting LLC*, 2010 WL 2038826 (S.D. Tex. May 20, 2010) (denying Chevron's motion to expand the scope of discovery ordered from the 3TM respondents beyond limited foundational deposition).  Most

courts, as well, have avoided any analysis of the merits of the underlying litigation, *see, e.g.*, *Chevron Corp. v. Stratus Consulting, Inc.,* 2010 WL 3923092, at *5 (D. Colo. Oct. 1, 2010) at 9, although others have opined on the merits of the underlying matter, *see, generally, In re Application of Chevron Corporation*, No. 10-mc-0002 LAK (S.D.N.Y.).

In this court's view, both applications here satisfy the threshold statutory requirements with regard to the civil and criminal proceedings in Ecuador, that is, the Lago Agrio Litigation insofar as it concerns Chevron and the criminal case against Pérez and Veiga. Bonifaz resides in Conway, Massachusetts; the discovery is for use in proceedings before foreign tribunals; and, as civil and criminal defendants in the Ecuadorian proceedings, the applicants are "interested persons" within the meaning of Section 1782.

The court also finds that the four discretionary factors enumerated by the Supreme Court in *Intel* weigh in favor of granting the Section 1782 applications with regard to the two Ecuadorian tribunals. First, Bonifaz is not a party to (or an attorney presently connected with) either the Lago Agrio Litigation or the criminal prosecution; as the Supreme Court indicated in *Intel*, the discovery allowed by Section 1782 is particularly needed where the discovery is sought from persons who are not participants in the proceeding abroad. *Intel*, 542 U.S. at 244 ("[N]onparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.")

Second, given the nature of these two foreign proceedings, the court finds that

its discovery assistance may well be needed.  For one thing, Pérez and Veiga face serious criminal charges in Ecuador and, although the evidence presented here with regard to Bonifaz is quite thin with regard to his knowledge or participation in the events leading up to those charges, he appears to have at least some information with regard thereto.  Moreover, even though it is not entirely clear that the Ecuadorian criminal court is receptive to such "discovery assistance," this court is nonetheless willing to grant Pérez and Veiga an opportunity to seek possibly exculpatory evidence.

Third and relatedly, the court does not believe that Pérez and Veiga are attempting to circumvent foreign proof-gathering restrictions.  Somewhat similarly, with regard to the third discretionary factor, Chevron is in a defensive posture in the Lago Agrio Litigation.

Finally, the burden on Bonifaz himself is not particularly significant.  The subpoenae seek documents which he has already identified as well as deposition testimony that is relevant to the defense of the criminal charges against the Individual Applicants and the defense by Chevron in the Lago Agrio Litigation.

Chevron's application also satisfies the statutory criteria of Section 1782 with respect to the Treaty Arbitration but, based on the discretionary factors described below, the court will not grant the requested discovery with regard thereto at this time. To be sure, Bonifaz is not a party to the Treaty Arbitration and, as indicated,  the burden on Bonifaz is not particularly significant.  The court, however, is not convinced that, given its nature, the Treaty Arbitration tribunal is at all receptive to or in need of this court's assistance with regard to the particular discovery sought here.

As a preliminary matter, the court assumes that the Treaty Arbitration meets the tribunal requirements for present purposes, although the question of Section 1782's applicability to international arbitration, whether private or public, is not without some controversy. *See, e.g., Norfolk So. Corp. v. Gen. Sec. Ins. Co. (In re Arbitration)*, 626 F. Supp. 2d 882, 885 (N.D. Ill. 2009) (interpreting *Intel*'s reference to "arbitration tribunals" as including state-sponsored arbitration bodies but excluding purely private arbitration); *La Comision Ejecutiva Hidro Electrica Del Rio Lempa v. El Paso Corp.,* 617 F. Supp. 2d 481, 483 (S.D. Tex. 2008) (holding that Section 1782 did not apply to arbitral panels); *In re Operadora DB Mexico,* 2009 WL 2423138 (M.D. Fla. Aug. 4, 2009) (denying Section 1782 application with regard to arbitration under the International Chamber of Commerce International Court of Arbitration). *See also* Jessica Weekley, *Discovering Discretion: Applying Intel to § 1782 Requests for Discovery in Arbitration*, 59 Case W. Res. L. Rev. 535, 552 (2009) ("Although *Intel* did not explicitly determine whether a private arbitral panel is a 'foreign or international tribunal,' it provided guidance for courts interpreting and applying § 1782"). Still, the court must also consider the discretionary factors set out in *Intel* to determine whether Section 1782 discovery is appropriate in particular cases. *Id.* ("To assist the lower courts in their exercise of discretion, *Intel* provides a list of factors to consider. The list is not necessarily exclusive and other considerations may be relevant, especially where the tribunal at issue has notably different characteristics than the tribunal in *Intel*. In arbitration proceedings, courts should therefore consider arbitration's general purpose as well as the policies of the jurisdiction controlling the panel.").

As another preliminary matter, the court understands that, as *Intel* opined, authorizing discovery of materials otherwise undiscoverable in a foreign jurisdiction will not necessarily offend the foreign tribunal because the tribunal could always limit the admissibility of the evidence once received. *Intel*, 542 U.S. at 261-62. In fact, in so ruling, the Supreme Court specifically overturned the First Circuit's decision in *In re Astra Medica, S.A.*, 981 F.2d 1, 6-7 (1st Cir. 1992), which had determined that Section 1782 did not justify allowing discovery that would infringe on another nation's judicial sovereignty. *See also Boreci v. Fiat S.P.A.*, 763 F.2d 17, 19 (1st Cir. 1985) (U.S.-style discovery could be deemed an "affront to [a] nation's judicial sovereignty"). Nonetheless, the Supreme Court left open the possibility that a district court could assess discoverability if it was doing so under the discretionary power to evaluate foreign receptivity. *Intel*, 542 U.S. at 264-65. Unfortunately, the Court did not provide standards with which a district court should assess the receptivity of foreign tribunals or, for that matter, whether a Section 1782 request circumvents foreign proof-gathering methods. This has led at least one commentator to opine that *Intel* has made it more rather than less difficult for district courts to assess foreign receptivity accurately. *See* Marat A. Massen, *Discovery for Foreign Proceedings After Intel v. Advance Micro Devices: A Critical Analysis of 28 U.S.C. § 1782 Jurisprudence*, 83 S. Cal. L. Rev. 875, 877 (2010).

This particular problem is minimized in the case at bar given the type of tribunal overseeing the arbitration between Chevron and the Republic of Equador. As described, the arbitration is authorized by a treaty between the United States and

Equador and, as far as this court understands, there is nothing to indicate that the international tribunal's processes are inadequate to obtain the discovery sought here. Accordingly, since international arbitrators usually control the discovery process, this court believes it should exercise at least some restraint before granting the instant Section 1782 application. Finally, the court has taken into account the fact that the Treaty Arbitration was initiated by the very party, Chevron, that now seeks extra-tribunal discovery without adequately disclosing the tribunal's own discovery practices and needs.

Granted, other courts in parallel proceedings have indicated that the "respondent" to a Section 1782 bears the burden of proving that the foreign tribunals are unreceptive to the discovery sought. *See In re Chevron Corp.*, 2010 WL 4883111, at *3 (W.D. Va. Nov. 24, 2010). In general, those courts believe that, "[t]o meet this burden, a respondent must demonstrate that a 'clear directive' or 'authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of Section 1782; such as 'judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures.'" *Id.* (quoting *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095,1100 (2d Cir. 1995)). This court does not necessarily agree with that approach.

First, the *Euromepa* decision predates *Intel* which, despite citing *Euromepa* for other purposes, did not address the burden question. To be sure, *Intel* did indicate that a Section 1782 applicant need not show that the information sought is necessarily discoverable in the foreign proceeding. *Id.*, 542 U.S. at 252. Moreover, it indicated

that a foreign tribunal's discovery limits did "not necessarily signal objection to aid from United States federal courts" and suggested further that "[a] foreign tribunal's reluctance to order production of materials present in the United States similarly may signal no resistance to the receipt of evidence gathered pursuant to § 1782(a)." *Id.* at 261-62. The *Intel* court went as far as discounting the statement by the European Commission, in an *amicus curiae* brief, that it did not need nor want the district court's assistance. *Id.* at 266. ("It is not altogether clear, however, whether the Commission, which may itself invoke § 1782(a) aid, means to say 'never' or 'hardly ever' to judicial assistance from United States courts."). Still, the question of whose burden it is to demonstrate receptivity or, for that matter, nonreceptivity of a foreign tribunal was not specifically addressed in *Intel*. The Supreme Court merely directed, as previously described, that "a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance." *Id.* at 264.

Second, this court is reluctant to readily impose the burden of proving "nonreceptivity" on a *respondent* to a Section 1782 application. Respondents, as here, are often individuals plucked out of their repose who *may* have information relevant to a foreign proceeding but not necessarily the wherewithal to mount a defense to an application, let alone, on short notice, to prove a negative, *i.e.*, a foreign tribunal's *non*receptivity to the discovery sought. To be sure, other interested parties to a Section 1782 dispute -- *e.g.*, the Republic in the instant matter -- may be more able to

16

do so, but the burden imposed would be no less daunting.

As a result, this court is inclined to follow the lead of District Judge Douglas Woodlock in this district who, post *Intel*, looked to *both* parties to offer at least some "authoritative proof" regarding the receptivity of the foreign tribunal to the discovery materials sought.  *See In re Babcock Borsig AG*, 583 F. Supp. 2d 233, 241-42 (D. Mass. 2008) (denying a § 1782 discovery request "until . . . the ICC provides some affirmative indication of its receptivity to the requested materials").  Given the absence of adequate proof here, the court also has doubts as to whether the instant discovery is appropriate or, rather, an attempt to circumvent proof-gathering mechanisms which may well be available in the Treaty Arbitration.

Third, as the parties explained at the December 15th hearing, the only matter presently before the Treaty Arbitration tribunal is its jurisdiction.  Chevron's argument to the contrary, the court is not convinced that the discovery sought regarding the Lago Agrio Litigation concerns the jurisdictional question.  Fourth, as a practical matter, Chevron can always independently seek to admit before the Treaty Arbitration tribunal the discovery which the court is otherwise prepared to authorize vis-a-vis the Lago Agrio Litigation.  Without more, however, the court is disinclined to allow the discovery in a more direct fashion.  Accordingly, for all these reasons, the court will deny without prejudice Chevron's Section 1782 request with regard to the Treaty Arbitration.

Fortunately, the parties to the instant matter have made it somewhat easier to determine the scope of the discovery inquiry with regard to Bonifaz.  First, in his responses, Bonifaz has not only set forth the scope of his knowledge with regard to the

proposed inquiries but, as well, has provided a privilege log and a list of documents which might be responsive. Second, the Ecuador Plaintiffs have pointed out that, as distinct from the extensive list of documentary topics appended to the proposed subpoenae, Chevron and the Individual Applicants have actually identified discrete topics on which they seek discovery. The court agrees.

Accordingly, despite Chevron's objection to any limits on its inquiry, the court has chosen to adopt the Ecuador Plaintiffs' proposal regarding the scope of the inquiry, finding it an accurate exposition of the applications themselves. The scope of the inquiry of Bonifaz, therefore, shall be limited to the production of non-privileged documents and testimony regarding the following topics:

1. Communications between the Ecuador Plaintiffs and/or their counsel and the Republic "with respect to efforts to get around and vitiate a release granted by the ROE to TexPet in 1998";

2. Communications between the Ecuador Plaintiffs and/or their counsel and the Republic regarding the assertion of criminal charges against Pallares and Veiga;

3. Any claimed falsification of reports by Dr. Charles Calmbacher or other experts in the Lago Agrio Litigation; and

4. Richard Cabrera's relationship with the Ecuador Plaintiffs' counsel and how he came to be appointed the independent expert in the Lago Agrio litigation.

Paragraphs 2 and 3 concern the Individual Applicants. All four paragraphs concern Chevron's application.

Third, the court's ruling has been assisted by the efforts of the various counsel, in particular counsel for the Republic, Chevron and the Individual Applicants, to narrow

some of the issues related to the documents covered by the Republic's privilege log. (See December 17, 2010 Letter (Document No. 43.). As a result, in accord with the suggestion made by the Republic's counsel, the court has allowed the deposition of Bonifaz to proceed with the right of the Republic to maintain its claims of privilege until, if necessary, further order of the court. (See Electronic Order (December 19, 2010.)) The court will also allow the deposition of Bonifaz to proceed subject to the right of the Ecuador Plaintiffs to maintain their claims of privilege until, if necessary, further order of the court. (See Document No. 45.)[1]

In a similar fashion, the court is prepared to grant Chevron's application as it concerns the Lago Agrio Litigation. (See Electronic Order issued this day; see also the court's ruling this day on the Ecuador Plaintiffs' Motion for Clarification (Document No. 46).)

In granting the applications, however, the court has maintained the privileges asserted for certain documents falling within the above-described inquiries. As the Supreme Court made clear in *Intel*, Section 1782 specifically provides that "[a] person may not be compelled to give his testimony or statement or to produce a document or other things in violation of any legally applicable privilege." 28 U.S.C. § 1782(b).

As the Republic argues, the attorney-client privilege rests at the core of our legal

---

[1] To be sure, the Ecuador Plaintiffs' Privilege Log does not appear to entirely track Bonifaz's Corrected Document Log and Identities. (See Document No. 29.) For example, the court has been unable to locate therein documents described as CH-1448-1450 or CH-1502. The parties shall endeavor to clarify any disputes with regard to these documents, if not other documents, among themselves.

system and promotes "disclosures by client to lawyer that better enable the client to conform his conduct to the requirements of the law and to present legitimate claims or defenses when litigation arises." *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981)). Allowing privileged conversations to be divulged would strike at the very heart of the privilege. *Mohawk Indus. v. Carpenter*, 130 S. Ct. 599, 606 (2009). This applies, as well, to communications which fall under the attorney work- product doctrine, which "'shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'" *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003) (quoting *United States v. Nobles*, 422 U.S. 225, 238 & n.11 (1975)). This protection applies to "'documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).'" *Id.* (quoting Fed. R.Civ. P. 26 (b)(3)).

To the extent Chevron and the Individual Applicants assert that the crime-fraud exception should overcome any privilege, the court finds that they have not met their heavy burden in establishing that narrow exception. More particularly, the court concludes that the applicants have not made a *prima facie* showing that Bonifaz's assistance was sought by the Ecuador Plaintiff in furtherance of a crime or fraud. *See United States v. Reeder*, 170 F.3d 93, 106 (1st Cir. 1999). In this regard, the court notes that several other district courts have expressly denied the applicants' requests to invoke the crime-fraud exception with respect to other respondents. *See, e.g.,*

*Chevron Corp. v. Shefftz*, --- F.Supp.2d --- , 2010 WL 4985663, at \*7 (D. Mass. Dec. 7,

2010 (as it concerns an expert hired by the Ecuador Plaintiffs); *Chevron Corp. v.*

*Stratus Consulting, Inc.*, 2010 WL 3923092, at \*11 (D. Colo. Oct. 1, 2010) at 19

(leaving adjudication of Chevron's assertion of the crime-fraud exception "to the

discretion and jurisdiction of the Ecuadorian court"); *In re Application of Chevron*

*Corporation* (Alberto Wray), No. 10-371 (D.D.C.) at 30 (declining to "opine on the

merits of Applicants' proffered 'crime-fraud exception' argument based on the record

created by the parties").  The fact that yet other courts have found that the crime-fraud

exception applies to other respondents during different time periods does not convince

this court otherwise.

DATED:   December 22, 2010

                /s/   Kenneth P. Neiman
                KENNETH P. NEIMAN
                U.S. Magistrate Judge